# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| MICHAEL HAMPTON and TONI TAYLOR, | ) ) ) | |
| Plaintiffs, | ) ) | NO. 3:24-cv-00863 |
| v. | ) ) | JUDGE CAMPBELL |
| THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM and ORDER</u>

Pending before the Court are motions to dismiss filed by Defendants District Attorney Glenn Funk (Doc. No. 92) and Assistant District Attorney General Chadwick Jackson (Doc. No. 80), which are ripe for review. (*See* Doc. Nos. 95, 88, 96, 94). For the reasons stated herein, the motions (Doc. Nos. 92, 80) are **GRANTED**.

## BACKGROUND[1]

In early 2014, two of Plaintiff Michael Hampton's companies, Autumn Assisted Living Partners, Inc. ("Autumn") and Vision Real Estate Investment Corporation ("Vision"), contracted with Defendants Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") and the Hospital Authority of Metro ("Hospital Authority") to purchase certain health care facilities and develop the surrounding real property owned and operated by Metro and the Hospital Authority (hereinafter the "Contracts"). Autumn was to operate and eventually purchase an assisted care living facility known as Knowles (hereinafter the "Facility"), and Vision was to

---

[1] The facts stated herein come from Plaintiffs' Revised First Amended Complaint (Doc. No. 78).

purchase and develop the surrounding land. Autumn operated the Facility from July 1, 2014, through January 2017.

Autumn reduced employee benefits when it assumed responsibility for the management of Facility, which upset one of the employees, Defendant Deborah Neal. In 2016, Neal fabricated rumors of deficient patient care at the Facility to the media and Metro Councilmen Shulman and Leonardo. In the Fall of 2016, former Metro Councilman Maynard spread the rumors started by Neal and propagated by Shulman and Leonardo that patient care at the Facility was deficient.

In January 2017, the Metro Legal Department and City Council terminated the Contracts. Also in January 2017, Metro Councilmen Shulman and Leonardo sent a letter to Metro's Chief Auditor, Defendant Mark Swann, requesting a "performance and financial audit" of Autumn's management of the Facility. Swann performed the requested audit and reported his findings to the Budget and Finance committee of the Metro Council on August 14, 2017.

During this presentation, Swann discussed his office's investigation and review of "resident trust funds," asserting that Autumn was required by law to establish, segregate, and maintain an account for certain resident funds separate from other funds received to operate the Facility. Swann told the committee that "we did refer the report to the district attorney's office because of the resident trust fund and the fact that we did have government moneys commingled with the supplements from the Hospital Authority." Swann further informed the committee: "Well, I'm not an expert in assisted – again, there's more regulations on nursing home trust funds. There's (sic) very few regulations related, if none, related to assisted living."

Shortly thereafter, in August 2017, Defendant District Attorney Glenn Funk authorized an investigator employed by his office, James (Benny) Goodman, to begin an investigation into Plaintiff Hampton and the operation and management of the Facility.

In September 2017, Swann issued a "Revised Audit" of Autumn's operation of the Facility, which acknowledged that: (1) none of the residents paid the full cost of their care; (2) the residents received adequate care; and (3) Autumn had saved Metro millions of dollars during the 31 months it managed the Facility. The Revised Audit also criticized the lack of recognized financial accounting procedures but cited no legal basis for Swann's assertion that Plaintiff Hampton was legally required to establish, segregate, maintain or otherwise account for certain resident funds separate from other funds received to operate the Facility. A letter from the director of the Hospital Authority, Defendant Joseph Webb, accepting and adopting the findings (Doc. No. 78-7), was attached to the Revised Audit.

In October 2017, General Funk requested that the Tennessee Bureau of Investigation ("TBI") begin an investigation of Plaintiff Hampton's management of the Facility. From October 2017 through March 2018, Investigator Goodman and TBI Agent Sells conducted interviews of various persons involved in management of the Facility, the selection of Plaintiff Hampton's companies as the purchaser and developer of the Facility and adjacent real property, and the accounting for the "resident funds."

In April 2018, General Funk assigned Jackson to manage the investigation and prosecution of Plaintiff Hampton. On April 18, 2018, Investigator Goodman requested assistance from the Metro Department of Audit in conducting an audit and review of the resident trust accounts for the Facility while under the ownership and control of Plaintiff Hampton. Thereafter, Swann appointed one of his new auditors, Defendant Laura Henry, to conduct an audit of the "resident trust funds" as requested by Investigator Goodman. From that point on, Henry was the primary contact from the Metro Department of Audit with the District Attorneys' Office regarding the financial operations of Plaintiff Hampton and the Facility.

During the summer of 2018, Jackson directed Henry to prepare a spreadsheet that purported to account for the "resident trust funds" of alleged residents of the Facility during the period of its management by Autumn, July 2014 through January 2017. Upon Plaintiffs' information and belief, Henry's spreadsheet relied on false information provided by Neal and incomplete documentation from the prior manager's operation of the Facility.

On or about December 14, 2018, Jackson presented the fabricated spreadsheet and inapplicable documentation to the Davidson County Grand Jury to obtain a 46-count Indictment against Plaintiff Hampton. Two years later, on December 8, 2020, Plaintiff Hampton's wife, Plaintiff Toni Taylor, was arrested pursuant to an Indictment issued by the Davidson County Grand Jury for theft of property, $2,500 to $10,000, a Class D Felony, in connection with a transfer of funds that included resident trust fund money.

In June 2022, Plaintiff Hampton moved to dismiss the indictment against him as legally and factually baseless, and on July 28, 2023, the Davidson County Criminal Court dismissed the indictment against Hampton. Approximately two weeks later, on or about August 10, 2023, the State dismissed its case against Plaintiff Taylor on the basis that there was no probable cause for having issued the indictment against her.

Plaintiffs filed the present lawsuit on July 16, 2024, claiming Defendants maliciously prosecuted them and engaged in a civil conspiracy to maliciously prosecute them, in violation of state and federal law. (*See* Doc. No. 1; Revised First Amended Complaint, Doc. No. 78).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

4

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id*. at 678. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Thus, dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Children's Servs.*, 679 F.3d 425, 429 (6th Cir. 2012).

## ANALYSIS

General Funk and Jackson both argue they should be dismissed under absolute prosecutorial immunity. Officials seeking the protection of absolute immunity bear the burden of showing that absolute immunity is justified. *See Jackson v. City of Cleveland*, 64 F.4th 736, 743 (6th Cir. 2023).

"Absolute immunity is a narrow, but powerful, protection given to prosecutors when they act as advocates participating in or preparing for a judicial proceeding." *Smith v. Wayne Cnty., Michigan*, 147 F.4th 613, 619 (6th Cir. 2025); *Jackson*, 64 F.4th at 743 ("Prosecutors receive absolute immunity from suit for conduct in initiating and pursuing criminal prosecutions."). Indeed, the Sixth Circuit has recognized that absolute prosecutorial immunity has a "long reach" and "extends even to 'unquestionably illegal or improper conduct,' including instances where a defendant is genuinely wronged." *Price v. Montgomery Cnty.*, 72 F.4th 711, 719 (6th Cir. 2023) (quoting *Cady v. Arenac County*, 574 F.3d 334, 340 (6th Cir. 2009)).

When determining whether prosecutor's actions should be shielded by absolute immunity, courts apply a functional approach that looks to nature of function performed, not the identity of the actor who performed it. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993); *Smith v. Wayne Cnty., Michigan*, 147 F.4th 613, 621 (6th Cir. 2025) ("The focus should always be on the function the prosecutor is performing."). "The analytical key to prosecutorial immunity ... is *advocacy*—whether the actions in question are those of an advocate." *Smith*, 147 F.4th at 619 (citation omitted) (emphasis in original). Because "advocacy does not start at the courtroom door," various preparatory activities outside the courtroom, such as the professional evaluation of evidence assembled by police and appropriate preparation for its presentation at trial, are also entitled to the protections of absolute immunity. *Id.* at 620-21.

On the other hand, "when a prosecutor performs administrative or investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, they are not entitled to absolute immunity." *Jackson*, 64 F.4th at 743 (citation modified). Examples of functions that are administrative or investigative in nature, and thus not entitled to absolute prosecutorial immunity, include giving legal advice to police, making out-of-court statements at press conference, making statements in affidavit supporting application for arrest warrant, and authorizing warrantless wiretaps in interest of national security. *See id*. at 744.

Here, the actions in question as to General Funk are his alleged "failure to train and supervise Defendant Chadwick Wyatt Jackson during the investigative portion of the prosecution of Hampton" and "for his direct involvement in the investigation of Hampton *prior to the issuance of the indictment* against Hampton and his involvement in the proffer session of Hampton during the pendency of the Indictment." (First Revised Amended Complaint, Doc. No. 78 ¶ 11) (emphasis in original). Similarly, the actions in question as to General Jackson are his alleged

6

roles "in the investigation of Hampton before the Indictment" and "during a proffer session after the indictment." (First Revised Amended Complaint, Doc. No. 78 ¶¶ 41, 12).

General Funk argues that he is entitled to prosecutorial immunity in connection with his alleged failure to train and supervise Defendant Jackson under *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (U.S. 2009) because the allegedly deficient training and supervision concern legal research, which is an activity that necessarily "requires legal knowledge and the exercise of related discretion." General Funk also notes the reasoning of the Supreme Court in *Van de Kamp* that "better training or supervision might prevent most, if not all, prosecutorial errors at trial, permission to bring such a suit here would grant permission to criminal defendants to bring claims in other similar instances, in effect claiming damages for (trial-related) training or supervisory failings." *Van de Kamp*, 555 U.S. at 347.

Next, are General Funk's alleged actions of authorizing and requesting pre-indictment investigations of Plaintiff Hampton and General Jackson's management of the same. General Funk argues his alleged authorizations of the investigations are an advocacy function, as the Sixth Circuit has held that "absolute immunity extends to a prosecutor's conduct in initiating a prosecution and in presenting the government's case as well as the administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." *Cooperrider v. Woods*, 127 F.4th 1019, 1028 (6th Cir. 2025) (quoting *Rieves v. Town of Smyrna*, 959 F.3d 678, 691 (6th Cir. 2020)) (citation modified). General Jackson argues he is not alleged to have personally engaged in the investigations he was overseeing; rather the allegations in the First Revised Amended Complaint are that he merely made the decision to prosecute after reviewing others' investigatory efforts. (*See* Doc. No. 81 at 8-9 (citing *Grant v. Hollenbach*, 870 F.2d 1135-36 (6th Cir. 1989) (prosecutors were protected by absolute immunity even though they had failed

7

to investigate adequately the charges that eventually formed the basis of a criminal complaint)). General Jackson further argues his pre-indictment evaluation of the evidence "cannot be characterized as merely administrative or … merely investigative." (*Id*. (quoting *Price v. Montgomery Cnty., Kentucky*, 72 F.4th 711, 721 (6th Cir. 2023)). General Funk argues prosecutorial immunity extends to his and General Jackson's alleged participation in the proffer session because his and General Jackson's decision on how to prosecute Hampton's case – including whether to pursue separate prosecution against other Metro officials – was also within their function as advocates. (Doc. No. 93 at 18 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 n.32 (U.S. 1976)).

Plaintiffs respond largely by restating the allegations from the First Revised Amended Complaint, summarizing various cases on prosecutorial immunity, and emphasizing the timing of the alleged actions as pre-indictment. (*See* Doc. Nos. 95, 88). However, Plaintiffs fail to respond to General Funk's and General Jackson's arguments premised on *Cooperrider*, *Grant*, or *Van de Kamp*. Nor do Plaintiffs make substantive arguments as to why General Funk's and General Jackson's alleged actions were administrative or investigative functions as opposed to advocate functions. (*See id*. at 18).  Accordingly, the Court finds that General Funk and General Jackson have met their burden of showing that absolute immunity is justified. *Jackson v. City of Cleveland*, 64 F.4th 736, 743 (6th Cir. 2023).

## CONCLUSION

For the reasons stated herein, General Funk's and General Jackson's motions to dismiss are **GRANTED** on absolute prosecutorial immunity grounds.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

8